# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE EXTRADITION OF ESTANISLAO FLORENCIO MORALES-HERNANDEZ | Case No. 1:13 -mc-00017-SAB<br><br>MEMORANDUM ORDER FINDING ESTANISLAO FLORENCIO MORALES-HERNANDEZ EXTRADITABLE<br><br>(ECF Nos. 1, 15, 16, 20, 21, 24) |

The United States of America ("the Government") filed a complaint in this matter seeking the extradition of Estanislao Florencio Morales-Hernandez ("Morales-Hernandez") at the request of the United Mexican States pursuant to a treaty between the United States of America and Mexico, Treaty Signed at Mexico City May 4, 1978, 1980 WL 309106 (Jan. 25, 1980). The Court finds that the Government has satisfied its burden under 18 U.S.C. § 3184, et seq. and has established that Morales-Hernandez is eligible to be extradited to Mexico.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

1

# I.

## BACKGROUND

On December 11, 2011, around 8:00 a.m. at the intersection with the highway to the town of Santiago Asuncion, Silacayoapam, in the State of Oaxaca, Edgar Ortiz Camacena ("decedent"), while in his vehicle waiting for a procession to pass by, was shot and killed. Three witnesses identified Morales-Hernandez as the individual who shot the decedent.

On February 14, 2012, an arrest warrant was issued for Morales-Hernandez. (ECF No. 17-1 at 17-65.)

On March 16, 2013, pursuant to an extradition treaty between Mexico and the United States, Treaty 31 U.S.T. 5059, ("Treaty"), and under federal laws supplementing and implementing such treaties, 18 U.S.C. § 3184, et seq., the United States issued a provisional arrest warrant for Morales-Hernandez, signed by United States Magistrate Judge Sheila K. Oberto. (ECF No. 2.) The warrant was issued on a complaint charging Morales-Hernandez with aggravated homicide with undue advantage. (ECF No. 1.)

On May 4, 2018, Morales-Hernandez appeared for his initial appearance on the complaint for extradition to Mexico and he was ordered to be detained. (ECF Nos. 7, 8.)

On November 9, 2018, an order issued setting a briefing schedule with an extradition hearing set for March 5, 2019. (ECF No. 14.)

On January 11, 2019, the Government filed a memorandum in support of extradition. (ECF No. 15.) Morales-Hernandez filed an opposition on February 8, 2019. (ECF No. 16.) On February 20, 2019, a formal extradition package was lodged which included certified documents. (ECF No. 17.) The Government filed a reply to Morales-Hernandez's opposition on February 22, 2019. (ECF No. 20.) On February 26, 2019, Morales-Hernandez filed a supplement to his opposition. (ECF No. 21.) On March 4, 2019, the Government filed the declaration of Tom Heinemann in support of the request for extradition. (ECF No. 24.)

An extradition hearing was held before the undersigned on March 5, 2019. (ECF No. 25.) Counsel Reed Grantham appeared with Morales-Hernandez who was in custody and was assisted by a Mixteco interpreter. (Id.) Counsel Vincenza Rabenn appeared for the Government.

The Government moved to admit the extradition package (ECF No. 17) and the declaration of Tom Heinemann (ECF No. 24) into evidence.[1] (Id.) Morales-Hernandez had no objection and the exhibits were admitted into evidence. Having considered the moving, opposition, and reply papers, as well as the Court record and the arguments presented at the March 5, 2019 hearing, the Court issues the following order.

## II.

## LEGAL STANDARD

"Extradition from the United States is a diplomatic process that is initiated by a request from the nation seeking extradition directly to the Department of State." Prasoprat v. Benov, 421 F.3d 1009, 1012 (9th Cir. 2005). Extradition requests are evaluated by the State Department to determine whether the request falls within scope of the relevant extradition treaty. Santos v. Thomas, 830 F.3d 987, 991 (9th Cir. 2016); Prasoprat, 421 F.3d at 1012. If the request falls within the treaty, a United States Attorney files a complaint in the district court seeking an arrest warrant for the person sought to be extradited. Santos, 830 F.3d at 991; Prasoprat, 421 F.3d at 1012.

"Extradition from the United States is governed by 18 U.S.C. section 3184, which confers jurisdiction on 'any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States' to conduct an extradition hearing under the relevant extradition treaty between the United States and the requesting nation, and to issue a certification of extraditability to the Secretary of State.' " In re Extradition of Santos, 795 F.Supp.2d 966, 969 (C.D. Cal. 2011); accord Santos, 830 F.3d at 991-992. The judge or magistrate is to hold a hearing to determine "whether (1) the crime is extraditable; and (2) there is probable cause to sustain the charge." Prasoprat, 421 F.3d at 1012.

The court has limited authority in the overall process of extradition as "[e]xtradition is a matter of foreign policy entirely within the discretion of the executive branch, except to the extent that the statute interposes a judicial function." Vo v. Benov, 447 F.3d 1235, 1237 (9th

---

[1] At the March 5, 2019 hearing, the parties agreed that Morales-Hernandez had previously been provided with the extradition package and Mr. Heinemann's declaration when the case was initiated.

Cir. 2006) (quoting <u>Lopez-Smith v. Hood</u>, 121 F.3d 1322, 1326 (9th Cir.1997)).  The court is not considering whether the extraditee is guilty, but merely whether there is competent legal evidence which would justify holding the individual for trial.  <u>Collins v. Loisel</u>, 259 U.S. 309, 315-16 (1922).  Competent evidence to establish probable cause is not necessarily evidence competent to convict.  <u>Fernandez v. Phillips</u>, 268 U.S. 311, 312 (1925).

In the extradition hearing, there are no discretionary decisions for the magistrate judge to make.  <u>Prasoprat</u>, 421 F.3d at 1012.  If the judge or magistrate "deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, or under section 3181(b), he shall certify the same, together with a copy of all the testimony taken before him. . .."  18 U.S.C. § 3184; <u>see</u> <u>Santos</u>, 830 F.3d at 992 ("So long as "the judicial officer determines that there is probable cause, he 'is required to certify the individual as extraditable to the Secretary of State.' ").  It is within the discretion of the Secretary of State to determine whether the individual will be surrendered.  <u>Prasoprat</u>, 421 F.3d at 1012.

"[T]he principles of international law recognize no right to extradition apart from treaty."  <u>Factor v. Laubenheimer</u>, 290 U.S. 276, 287 (1933).  "The right of a foreign sovereign to demand and obtain extradition of an accused criminal is created by treaty."  <u>Quinn v. Robinson</u>, 783 F.2d 776, 782 (9th Cir. 1986).  To determine the right to demand extradition and the correlative duty to surrender, the court looks to the treaty that created the right.  <u>Factor</u>, 290 U.S. at 287.  "Treaties must receive a fair interpretation, according to the intention of the contracting parties, and so as to carry out their manifest purpose."  <u>Wright v. Henkel</u>, 190 U.S. 40, 57 (1903).  "Extradition treaties are to be liberally construed so as to effect their purpose, that is, to surrender fugitives for trial for their alleged offenses."  <u>In re Extradition of Santos</u>, 795 F.Supp.2d at 970 (quoting <u>Valentine v. United States ex rel. Neidecker</u>, 299 U.S. 5, 14 (1936)).

### III.

### EVIDENCE IN SUPPORT OF AND IN OPPOSITION TO EXTRADITION

"The admissibility of evidence in an extradition proceeding is governed by 'the general extradition law of the United States and the provisions of the Extradition Treaty.' "  <u>In re Extradition of Mathison</u>, 974 F.Supp.2d 1296, 1304 (D. Or. 2013) (quoting <u>In re Extradition of</u>

<u>Santos</u>, 795 F.Supp.2d at 970).  Evidence presented by the Government must be "properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped, and the certificate of the principal diplomatic or consular officer of the United States resident in such foreign country shall be proof of the same[.]"  18 U.S.C. § 3190.

**A.     Government's Evidence in Support of Extradition**

1.     Sworn Affidavit in Support of Formal Extradition Request in Criminal Case: 39/2012 of the Constitutional Rights Court of the Judicial District of Huajuapan de Leon, Oaxaca.  (ECF No. 17-1 at 3-15.)

2.     Arrest Warrant issued in Constitutional Rights Court of Huajuapan de Leon Oacaca on February 14, 2012.  (ECF No. 17-1 at 17-67.)

3.     Official Letter from Diego Roberto Tovar Sanchez, dated June 2, 2018, regarding statute of limitations.  (ECF No. 17-1 at 69-70.)

4.     Excerpts from Criminal Code for the Free and Sovereign State of Oaxaca.  (ECF No. 17-1 at 72-73.)

5.     Statement of Witness, Armando Venancio Bolanos Bonilla, December 15, 2011.  (ECF No. 17-1 at 75-77.)

6.     Witness Interview of Agapito Raul Reyes Flores, dated December 11, 2011.  (ECF No. 17-1 at 79-81.)

7.     Witness Statement of Agapito Raul Reyes Flores (hereafter "Mr. Flores"[2]), dated December 15, 2011.  (ECF No. 17-1 at 82-84.)

8.     Witness Statement of Luis Fernando Castellanos Salgado, dated December 15, 2011.  (ECF No. 17-1 at 86-87.)

9.     Passport of Luis Fernando Castellanos-Salgado (hereafter "Mr. Salgado").  (ECF No. 17-1 at 88.)

10.     Personnel Displacement, Corpse Removal, On-Site Inspection and Registry of

---

[2] The Court notes that throughout the record the witnesses are identified by differing variations of their names.  The Court shall use the names as set out in this section for future references of the parties.

Crime Scene Proceedings.  (ECF No. 17-1 at 90-94.)

11.     Autopsy Report for Edgar Ortiz Camacena.  (ECF No. 17-1 at 96-98.)

12.     Record of Physical Characteristics of the Accused.  (ECF No. 17-1 at 100.)

13.     Death Certificate of Edgar Ortiz Camacena.  (ECF No. 17-1 at 102-103.)

14.     Ballistics Report, dated January 20, 2012.  (ECF No. 17-1 at 105-107.)

15.     Expert Report by Salatiel Sanchez Hilario (hereafter "Mr. Hilario"), dated January 24, 2012.  (ECF No. 17-1 at 109-116.)

16.     Statement of Armando Venancio Bolanos Bonilla, dated January 25, 2013.  (ECF No. 17-1 at 118-121.)

17.     Photo identification by Armando Bolanos Bonilla.  (ECF No. 17-1 at 122-123.)

18.     Photo identification by Florencia Catalina Camacena Pizarro (hereafter "Ms. Camacena").  (ECF No. 17-1 at 125-129.)

19.     Photograph of Estanislao Florencio Morales-Hernandez.  (ECF No. 131.)

**B.      Morales-Hernandez Evidence in Opposition to Extradition**

1.      Death Certificate of Armando Venancio Bolanos Bonilla (hereafter "Mr. Bonilla").  (ECF No. 16-1 at 1.)

2.      Expert Report by Hipolito Carlos Jimenez Rojano (hereafter "Mr. Rojano").  (ECF No. 16-2 at 1-106.)

3.      Official Documentation Surrounding Search Warrant Execution.  (ECF No. 16-3 at 1-4.)

**IV.**

**DISCUSSION**

"Foreign states requesting extradition are not required to litigate their criminal cases in American courts[;] and therefore, "the scope of the extradition court's review 'is limited to a narrow set of issues concerning the existence of a treaty, the offense charged, and the quantum of evidence offered.' "  <u>Santos</u>, 830 F.3d at 991.  "The larger assessment of extradition and its consequences is committed to the Secretary of State."  <u>Id.</u> (quoting <u>United States v. Kin–Hong</u>, 110 F.3d 103, 110 (1st Cir.1997).

To obtain a certification of extraditability on behalf of a requesting state, the United States has the burden of demonstrating each of the following elements: (1) the court possesses subject matter jurisdiction to conduct extradition proceedings; (2) the court possesses personal jurisdiction over the person named in the extradition request; (3) a valid extradition treaty exists between the requesting state and the United States; (4) the extradition treaty between the requesting state and the United States is, and at all relevant times has been, in full force and effect; (5) the person named in the extradition request is charged with having committed a criminal offense within the jurisdiction of the requesting state; (6) the charged offense is extraditable under the relevant extradition treaty (that is, the offense charged falls within the terms of the relevant extradition treaty); (7) the person named in the extradition request is the person arrested and brought before the court; and (8) there is competent evidence establishing probable cause to believe that the person named in the extradition request committed the charged offense.

In re Extradition of Santos, 795 F.Supp.2d at 969-70.

In this instance, Morales-Hernandez challenges only whether probable cause exists to sustain the charge. The Court therefore only briefly addresses the other considerations.

### A. Jurisdiction

This Court has jurisdiction pursuant to 18 U.S.C. § 3184 to entertain and rule on the request for extradition under the treaty between the United States of America and Mexico. "A district court has jurisdiction over a fugitive found within its jurisdictional boundaries." In re Extradition of Camelo-Grillo, No. CV 16-9026 JVS (SS), 2017 WL 2945715, at *5 (C.D. Cal. July 10, 2017). Morales-Hernandez is subject to personal jurisdiction as he has been found in this judicial district.[3] Further, the Court finds that Morales-Hernandez has been charged with committing a crime within the requesting state and is the person arrested and brought before the Court.

### B. A Valid Treaty Exists

"The advice and consent of the Senate is a constitutional prerequisite to a valid treaty, and the executive branch does not have the power to extradite alleged criminals absent a valid extradition treaty." Then v. Melendez, 92 F.3d 851, 853 (9th Cir. 1996). The treaty here was ratified by the President of the United States on December 13, 1979, and ratified by Mexico on

---

[3] At the March 5, 2019 hearing, counsel expressed that initially there was some concern whether the Court had jurisdiction over Morales-Hernandez because there was no evidence that he was present or arrested in this judicial district. However, counsel stated that if required he was sure that the Government could present such evidence. The Court finds that any such argument as to jurisdiction has therefore been waived.

January 31, 1979.  United States of America Mexico Extradition Treaty, 31 U.S.T. 5059, 1980 WL 309106.  On January 25, 1980, the treaty between the United States of America and the United Mexican States entered into force.  Id.  The President proclaimed the treaty between the United States and Mexico on February 6, 1980.  Id.

Tom Heinemann, an Assistant Legal Adviser in the Office of the Legal Adviser for the Department of State, Washington, D.C., has submitted a declaration in support of extradition.  (ECF No. 24 at 1-3.)  Mr. Heinemann states that the treaty between the United States and Mexico is in full force and effect.  (Id. at ¶ 2.)  The Court should defer to the decisions of the executive branch in determining whether a valid extradition treaty remains in force.  Then, 92 F.3d at 854.  The Court finds that a valid extradition treaty between the United States of America and the United Mexican States has been in full force and effect during the relevant time period.

**C.    Extraditable Offense**

The Government must prove that the offense charged is an extraditable offense covered under the Treaty and that the offense would be criminal in both the United States and Mexico.  Emami v. U.S. Dist. Court for N. Dist. of California, 834 F.2d 1444, 1450 (9th Cir. 1987).  Morales-Hernandez has been charged with aggravated homicide with undue advantage as punishable under Article 291 of the Penal Code for the State of Oaxaca.  (ECF Nos. 1, 17-1 at 17-65.)

Pursuant to Article 2(1) of the treaty, "[e]xtradition shall take place, subject to this Treaty, for wilful acts which fall within any of the clauses of the Appendix and are punishable in accordance with the laws of both Contracting Parties by deprivation of liberty the maximum of which shall not be less than one year."  31 U.S.T. 5059.  Article 2(3) provides that "[e]xtradition shall also be granted for wilful acts which, although not being included in the Appendix, are punishable, in accordance with the federal laws of both Contracting Parties, by a deprivation of liberty the maximum of which shall not be less than one year."  Id.

The Government contends that the crime is extraditable as murder is specifically listed in the appendix to the treaty as an extraditable offense and is punishable in both countries by a sentence of not less than one year.  The appendix of the treaty lists murder or manslaughter as an

extraditable offense.  <u>See</u> Appendix to 31 U.S.T. 5059.

The Government argues that offense which Morales-Hernandez was charged in Mexico would be criminal under the laws of the United States as a violation of 18 U.S.C. § 1111 or under California State law as a violation of Penal Code Sections 187 and 190 which provide for maximum sentences well beyond one year.

Under the principle of dual criminality, "no offense is extraditable unless it is a crime in both jurisdictions."  <u>Emami</u>, 834 F.2d at 1449 (quoting <u>Caplan v. Vokes</u>, 649 F.2d 1336, 1343 (9th Cir. 1981)).  "It is well established that all the principle of dual criminality requires is that the particular acts alleged constitute a crime in both jurisdictions."  <u>Emami</u>, 834 F.2d at 1450. Neither the name of the crime nor the scope of liability is required to be coextensive or the same in both countries.  <u>Id.</u>  In determining if the conduct would be a crime in the United States, courts are to look to "similar criminal provisions of federal law or, if none, the law of the place where the fugitive is found or, if none, the law of the preponderance of the states."  <u>Cucuzzella v. Keliikoa</u>, 638 F.2d 105, 107 (9th Cir. 1981).

Article 285 of the Oaxaca Criminal Code provides that the "crime of homicide is committed by whoever takes another's life."  (ECF No. 17-1 at 73.)  Article 301 provides that unfair[4] advantage exists where "the perpetrator is stronger due to weapons used, due to greater skill with those weapons, or by the number of persons accompanying. . .."  (<u>Id.</u>)

Pursuant to 18 U.S.C. § 1111, "[m]urder is the unlawful killing of a human being with malice aforethought.  Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing . . . is murder in the first degree.  Any other murder is murder in the second degree."  18 U.S.C. § 1111(a).  Murder in the first or second degree is punishable by a term of years or for life.  18 U.S.C. § 1111(b).

Under California law, murder is defined as the unlawful killing of a human being with malice aforethought.  Cal. Pen. Code § 187(a).  Murder that is "perpetrated by means of a destructive device or explosive, . . . or by any other kind of willful, deliberate, and premeditated

---

[4] The Court notes that the crime is referenced alternately as undue advantage and unfair advantage throughout the moving papers.  However, whether called undue or unfair advantage they refer to the same code section, Article 301.

killing . . . is murder of the first degree.  Id.  All other kinds of murder are of the second degree. Cal. Pen. Code § 187(b).  First degree murder in punishable by death, imprisonment for life without the possibility of parole, or imprisonment for 25 years to life.  Cal. Pen. Code § 190(a). Second degree murder is punishable by imprisonment for 15 years to life.  Cal. Pen. Code § 190(b).

Morales-Hernandez does not dispute the issue of dual criminality.  The crime is specifically listed in the treaty as an extraditable offense and the Court finds that the the conduct alleged here, firing a shotgun at an individual which inflicts mortal wounds, would be criminal under the laws of the United States.  The principle of dual criminality is satisfied and the conduct constitutes an extraditable offense under the terms of the Treaty.

**D.      Probable Cause**

A hearing must be held to determine whether there is probable cause to believe the individual committed the crime charged.  Santos, 830 F.3d at 991.  The Supreme Court has described the extradition hearing to determine probable cause as akin to a grand jury investigation or a preliminary hearing.  Id.  "The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction."  Id. at 991–92 (quoting Collins, 259 U.S. at 316).

Morales-Hernandez argues that the evidence submitted by the requesting state is not competent for the Court to find probable cause exists and submits evidence which he contends is explanatory and admissible.  The Government counters that the evidence offered by Mexico is competent to support probable cause and the evidence submitted by Morales-Hernandez is contradictory; and therefore, is not admissible in this proceeding.

1.      The Evidence in Support of Extradition Comports with Treaty Requirements

The Court first addresses the evidence presented by the Government in support of extradition.  Article 10 of the treaty provides that

2.- The request for extradition shall contain the description of the offense for which extradition is requested and shall be accompanied by:
a) A statement of the facts of the case;

10

b) The text of the legal provisions describing the essential elements of the offense;
c) The text of the legal provisions describing the punishment for the offense;
d) The text of the legal provisions relating to the time limit on the prosecution or the execution of the punishment of the offense;
e) The facts and personal information of the person sought which will permit his identification and, where possible, information concerning his location.
3.- In addition, when the request for extradition relates to a person who has not yet been convicted, it shall be accompanied by:
a) A certified copy of the warrant of arrest issued by a judge or other judicial officer of the requesting Party;
b) Evidence which, in accordance with the laws of the requested Party, would justify the apprehension and commitment for trial of the person sought if the offense had been committed there.
. . .
5.- All the documents that must be presented by the requesting Party in accordance with the provisions of this Treaty shall be accompanied by a translation in the language of the requested Party.
6.- The documents which, according to this Article, shall accompany the request for extradition, shall be received in evidence when:
. . .
b) In the case of a request emanating from the United Mexican States, they are certified by the principle diplomatic or consular officer of the United States in Mexico.

31 U.S.T. 5059.

Morales-Hernandez does not challenge that the documents submitted in support of extradition comply with the treaty and upon review of the documents provided by the Government, the Court finds that they comport with the treaty requirements and are properly authenticated under the law of the United States.  18 U.S.C. § 3190.

2.      Morales-Hernandez's Evidence is Inadmissible in this Proceeding

The Government objects to the evidence submitted by Morales-Hernandez on the ground that it is not explanatory evidence, but is evidence that is intended to contradict the evidence submitted by Mexico.

As addressed above, the scope of the current proceeding is to determine if there is competent legal evidence to justify holding Morales-Hernandez for trial, and it is not for this court to determine if the evidence is competent to convict.   Collins, 259 U.S. at 315-16; Fernandez, 268 U.S. at 312.  An extradition hearing is not a criminal proceeding and the person for whom extradition is sought is not entitled to the same rights available in a criminal trial. Matter of Extradition of Mainero, 990 F.Supp. 1208, 1218 (S.D. Cal. 1997); Simmons v. Braun, 627 F.2d 635, 636 (2d Cir. 1980); Charlton v. Kelly, 229 U.S. 447, 459-62 (1913); Glucksman v.

1   | Henkel, 221 U.S. 508, 512 (1911).

2   |      The accused "does not have the right to introduce evidence in defense because that would
3   | require the government seeking his extradition 'to go into a full trial on the merits in a foreign
4   | country.' " Santos, 830 F.3d at 992 (quoting Collins, 259 U.S. at 316). The admissibility of
5   | evidence in the extradition hearing is determined by whether it is contradictory evidence or
6   | explanatory evidence. Collins, 259 U.S. at 316-17. "Evidence that conflicts with that submitted
7   | on behalf of the demanding party is not permitted, nor is impeachment of the credibility of the
8   | demanding country's witnesses." Matter of Extradition of Mainero, 990 F.Supp. at 1218.

9   |      While the difference between explanatory and contradictory evidence may be difficult to
10  | determine, the Ninth Circuit has found "that 'explanatory' evidence is evidence that 'explains
11  | away or completely obliterates probable cause,' whereas contradictory evidence is that which
12  | 'merely controverts the existence of probable cause, or raises a defense.' " Santos, 830 at 992
13  | (quoting Mainero v. Gregg, 164 F.3d 1199, 1207 n.7 (9th Cir. 1999)). The accused may submit
14  | evidence which "explain[s] matters referred to by the witnesses for the government[,]" but
15  | evidence that merely contradicts the testimony of the prosecution may be excluded. Santos, 830
16  | F.3d at 992 (citations omitted). "An accused in an extradition hearing has no right to contradict
17  | the demanding country's proof or to pose questions of credibility as in an ordinary trial, but only
18  | to offer evidence which explains or clarifies that proof." Eain v. Wilkes, 641 F.2d 504, 511 (7th
19  | Cir. 1981). "Admission of evidence in an international extradition proceeding is within the
20  | magistrate's discretion." Matter of Extradition of Kraiselburd, 786 F.2d 1395, 1399 (9th Cir.
21  | 1986).

22  |      First, Morales-Hernandez seeks to admit the death certificate of Mr. Bonilla. He argues
23  | that this is explanatory evidence because it demonstrates that Mr. Bonilla is no longer alive and
24  | is unavailable to participate in any future proceedings. However, the fact that Mr. Bonilla is no
25  | longer alive would not explain away or obliterate probable cause in this matter. See Cohen v.
26  | Benov, 374 F.Supp.2d 850, 858 (C.D. Cal. 2005) (fact that complaining witness has died is for
27  | the requesting country's courts to address and does not negate probable cause). While it does go
28  | the admissibility of the statements made by Mr. Bonilla in any trial of this matter, the issue is not

for this Court to address.  It is not for this Court to assess the probability that the requesting party will be able to secure a conviction.  <u>Matter of Extradition of Mainero</u>, 990 F.Supp. at 1216.  Accordingly, the Court finds that the death certificate of Mr. Bonilla is inadmissible in this proceeding as it is not explanatory evidence that would explain or clarify Mr. Bonilla's or any other witnesses' statements made in this matter.

Next, Morales-Hernandez seeks to admit an expert report by Hipolito Carlos Jimenez Rojano.  Mr. Rojano was hired by Morales-Hernandez's family to "analyze the subjective and objective investigation documentation" of the Mexican government.  Mr. Rojano analyzed the statements and reports within the official documentation with the objective of finding the truth regarding the facts that occurred.  Morales-Hernandez argues that Mr. Rojano's report is explanatory and is not contradictory of the Government's evidence, but the purpose of the report itself demonstrates that it merely contradictory evidence to refute the Government's proof and is not explanatory.  Morales-Hernandez states that the report explains ambiguities in the evidence or doubtful elements of the Government's case, but this is merely making a determination regarding the credibility of the witnesses and is offered to contradict the Government's case.  Further, that this report is contradictory rather than explanatory is demonstrated by the fact that it provides expert opinion conflicting with the Governments' ballistic and crime scene expert reports.  Mr. Rojano's report does not obliterate the Government's evidence but presents a different interpretation of the Government's evidence.  For example, Mr. Rojano concluded that the percipient witnesses were never present at the crime scene and that the state investigating officer was incorrect in opining as to the position of the perpetrator.  (ECF No. 16-2 at 13.)  As such it is contradictory and is inadmissible in this proceeding.  It is not for the extradition court to weigh conflicting evidence in determining if probable cause exists.  <u>Barapind v. Enomoto</u>, 400 F.3d 744, 750 (9th Cir. 2005).  To the extent that Morales-Hernandez argues that there are inconsistencies in the evidence, such inconsistencies will be considered in evaluating whether probable cause exists.

Lastly, Morales-Hernandez seeks to admit a report regarding a search warrant to apprehend him that was executed on March 2, 2012.  The report states that five rooms were

inspected on the upper floor and three rooms were inspected on the lower floor of the home for the purpose of apprehending the suspect and the suspect was not found. Morales-Hernandez seeks to admit this as evidence that during the search of the premises no items linking him to the murder were found. While Morales-Hernandez seeks to admit this evidence to show that no physical evidence was found linking him to the crime, the Court finds that, due to the passage of time since Morales-Hernandez had fled the jurisdiction, even if the premises were searched and no evidence was found linking him to the crime, it would not explain away or obliterate the Governments' evidence.[5]

The Court finds that the evidence sought to be admitted by Morales-Hernandez in this proceeding is not explanatory, but is at the most contradictory evidence which is inadmissible in this proceeding.

3. <u>Government's Evidence in Support of Extradition</u>

a. **Statement of Agapito Raul Reyes Flores**

On December 11, 2011, at 1:15 p.m., an interview was conducted of Mr. Flores, who was thirty-nine-years-old. (ECF No. 17-1 at 79-81.) Mr. Flores provided the following sworn statement. On December 11, at approximately 8:10 a.m.,[6] he was drinking beer with some friends in his hometown when he saw a brass band passing by the place celebrating the Virgin of Guadalupe. (<u>Id.</u> at 80.) He went with his friends to follow the band. (<u>Id.</u>) When he arrived at the corner of Ninos Heroes, the decedent was in his Chevrolet Silverado pick up and honked his horn. (<u>Id.</u>) Mr. Flores turned and realized it was his friend driving, so he stayed to talk to him. (<u>Id.</u>) He told the decedent that he had been really drunk yesterday. (<u>Id.</u>) The decedent answered, "YEAH DUDE, BUT LET'S DRINK A SIX-PACK OF BEER OVER THERE." (<u>Id.</u>) Mr. Flores realized that a navy-blue Ranger pick-up truck had pulled up behind the decedent's truck. (<u>Id.</u>) He immediately recognized the driver of the pick-up truck and told the decedent to move so they could pass. (<u>Id.</u>) The decedent looked in his rearview mirror but did not say

---

[5] Morales-Hernandez also includes an exhibit D. However, English translations of these documents have not been included so the Court does not address them.

[6] Although the English translation stated 12:10 a.m., the original indicates that it was 8:10 a.m. (ECF No. 17-1 at 215.)

anything.  (Id.)

The driver of the Ranger got out of the vehicle.  (Id.)  Mr. Flores knew him at the time as "Lani" but now knows that his name is Estanislao Florencio Morales-Hernandez.  (Id.)  Morales-Hernandez was holding a rifle in his hands.  (Id.)  Morales-Hernandez came toward the driver's side of the decedent's vehicle and said, "WHY EVERY TIME YOU PASS IN FRONT OF MY HOUSE YOU FIRE SHOTS? NOW LET'S SETTLE THIS!"  (Id.)  Mr. Flores took two steps back and Morales-Hernandez started shooting the decedent with his rifle.  (Id.)  He fired three shots and when he saw that the decedent did not move anymore he turned toward Mr. Flores and aimed at his chest without saying anything.  (Id.)  Mr. Flores did not say anything.  (Id.)  Since Mr. Flores did not look away, Morales-Hernandez got in his pickup truck and reversed, driving to the town of Nieves.  (Id.)

Mr. Flores ran to where the band was to tell people what had happened, but no one wanted to go and see.  (Id.)  Later, he saw that some people had arrived to look at the corpse and he went back.  (Id. at 80-81.)  The state police arrived later.  (Id. at 81.)

Mr. Flores gave a second sworn statement on December 15, 2011, at 12:45.[7]  (Id. at 82-83.)  Mr. Flores was thirty-nine-years-old, married, and was a substitute municipal agent.  (Id. at 82.)  On December 11, 2011, at approximately 8:00, he was going with the brass band to the town of Santiago Asuncion, Silacayoapam, Oaxaca.  (Id.)  The decedent arrived in his black Chevrolet Silverado truck, without license plates, and honked his horn.  (Id.)  Mr. Flores went to the decedent's truck.  (Id.)  The decedent was with El Zapo, who is Mr. Bonilla.  (Id.)  Mr. Bonilla was a passenger in the truck.  (Id.)  Mr. Flores stood next to the driver's side of the truck talking to the decedent.  (Id.)  The decedent told Mr. Flores that he was going to play basketball in the court at Santiago de Asuncion and Mr. Flores responded that it was okay for him to play.  (Id.)  Mr. Salgado, who was filming the pilgrimage of the brass band arrived and started talking to the decedent.  (Id.)

A navy-blue Ford Ranger truck parked behind decedent's vehicle and Morales-

---

[7] The Court notes that the English translation of the document states the date of this interview as December 15, 2015, however upon review of the original document and based on the Morales-Hernandez statement of facts (ECF No. 16 at 11), it appears that this was a transcription error and the interview occurred on December 15, 2011.

Hernandez, who Mr. Flores knew as El Lany, got out.  (Id. at 82-83.)  Morales-Hernandez was carrying a rifle in his hands and walked toward the decedent.  (Id. at 83.)  Salgado left to continue filming the brass band.  (Id.)  Morales-Hernandez told the decedent, "MEGA (sic) BECAUSE EVERY TIME YOU DRINK, YOU ALWAYS SHOOT BY MY DOOR."  Morales Hernandez also said, "DO WE FIX IT OR WHAT DO WE DO?"  The decedent answered: "OK."  (Id.)  The decedent looked at Morales-Hernandez and Morales-Hernandez shot him with the rifle and grazed decedent's right cheek.  (Id.)  The decedent bent to the right and Morales-Hernandez shot him three times putting the gun closer to decedent's body, 30 to 40 cm.  (Id.)  The decedent was shot once in the left arm, and twice in the left side of his back.  (Id.)

Morales-Hernandez told Mr. Bonilla that he was going to get fucked and aimed the rifle at him.  (Id.)  Mr. Bonilla said that he had no problem with him and asked Morales-Hernandez not to kill him and to let him go.  (Id.)  Morales-Hernandez told him to get down and to go to hell motherfucker.  (Id.)  Morales-Hernandez saw Mr. Flores standing next to the truck and aimed the rifle at his chest without saying anything.  (Id.)  Since Mr. Flores did not stop looking at him, Morales-Hernandez turned and got into his truck, driving toward Ixpantepec Nieves.  (Id.)  Mr. Flores ran to the tell the band members what had happened.  (Id.)

**b.  Statements of Armando Venancio Bolanos Bonilla**

On December 15, 2011, Mr. Bonilla gave a statement to Officer Casildo Perez Martinez. (ECF No. 17-1 at 75-77.)  Mr. Bonilla, a thirty-nine-year-old married cab driver, was sworn in and testified as follows.  On December 11, 2011, Mr. Bonilla was staying at his father's house because he was participating in a basketball tournament at Santiago Asuncion, Silacayoapam, Oaxaca.  (Id. at 75.)  At approximately 7:45 a.m., the decedent arrived in his black Chevrolet Silverado truck, which had no license plates, to go to play basketball at Santiago Asuncion.  (Id.)  Mr. Bonilla went with the decedent in his truck and noticed that the decedent had a handgun with a white handle on his right leg.  (Id.)

They arrived at the entrance of Santiago Asuncion, on Calle Ninos Heroes, and a brass band was walking a pilgrimage to the church's courtyard.  (Id. at 75-76.)  The decedent was driving the truck and Mr. Bonilla was a passenger.  (Id. at 76.)  The decedent honked his horn at

Mr. Flores who was walking alone in the pilgrimage. (Id.) Mr. Flores approached the driver's side of the truck and began chatting with the decedent. (Id.) Mr. Salgado, who was filming the brass band in the pilgrimage, came up to talk to the decedent also. (Id.)

A truck pulled up behind them, and Mr. Bonilla told the decedent to move forward so the other truck could get by. (Id.) The decedent said that he would move in a minute and Mr. Bonilla heard the driver of the other truck, Morales-Hernandez, open the door and go toward the decedent. (Id.) Mr. Salgado walked away to continue filming the band. (Id.) Morales-Hernandez came up to the truck and said to the decedent, "MEGA, WHY EVERY TIME YOU DRINK YOU SHOOT AT MY DOOR?" (Id.) Morales-Hernandez also said, "ARE WE GONNA FIX THIS OR WHAT?" (Id.) The decedent answered, "ALRIGHT" and turned to see Morales-Hernandez. (Id.) Morales-Hernandez fired a shot with a shotgun from approximately 80 cm, grazing the decedent in the right check. (Id.) Immediately thereafter, Morales-Hernandez fired three more shots at the decedent from a distance of 30 to 40 cm. (Id.) One shot hit the decedent in the left arm and two shots hit him in the left side of his back as Morales-Hernandez wedged the shotgun inside the truck. (Id.)

Morales-Hernandez told Mr. Bonilla, "YOU ARE FUCKED TOO" and pointed the shotgun at him at which time Mr. Bonilla noticed that the shotgun had a brown handle. (Id.) Mr. Bonilla said that he did not have a problem with Morales-Hernandez and they were just going to play. (Id. at 76-77.) He asked Morales-Hernandez to please not kill him and to let him go. (Id.) Morales-Hernandez responded, "ALRIGHT. GET THE FUCK OUT OF HERE." (Id. at 77.) Mr. Bonilla got out of the truck and went toward the basketball court. (Id.) He heard that Morales-Hernandez drove toward Ixpantepec Nieves. (Id.) It was about 8:00 a.m. (Id.) He saw that Morales-Hernandez had left and went back to see if the decedent was alive, but he was dead. (Id.)

On January 25, 2013, Mr. Bonilla provided a sworn statement regarding a photographic lineup to identify the individual who shot the decedent. (ECF No. 17-1 at 118-121.) Mr. Bonilla was provided with a photographic lineup containing six male persons. (Id. at 119.) Mr. Bonilla identified Morales-Hernandez as the individual who fired the shotgun killing the decedent on

1 December 11, 2011.  (<u>Id.</u> at 120.)  Mr. Bonilla provided a statement as to the events that
2 occurred.

3       At 8:00 a.m. on December 11, 2011, the decedent was driving his truck on Calle Ninos
4 Heroes in the town of Santiago Asuncion, Silacayoapam, Oaxaca.  (<u>Id.</u>)  Mr. Bonilla was sitting
5 in the passenger seat of the truck.  (<u>Id.</u>)  They came upon a procession going to the town center
6 so they stopped.  (<u>Id.</u>)  The decedent called over Mr. Flores and began talking to him.  (<u>Id.</u>)  Mr.
7 Salgado came by because he was filming the brass band and the procession.  (<u>Id.</u>)  Morales-
8 Hernandez pulled up behind them in a Ford truck and parked.  (<u>Id.</u>)  Morales-Hernandez got out
9 of the truck and came toward the decedent.  (<u>Id.</u>)  Morales-Hernandez asked why every time the
10 decedent got drunk he fired shots at Morales-Hernandez's house and if he wanted to fix the
11 problem.  (<u>Id.</u>)  When the decedent said yes, Morales-Hernandez shot the decedent in the face
12 and then fired three more shots.  (<u>Id.</u>)  Morales-Hernandez got back in his truck and left.  (<u>Id.</u>)
13 Since that time, Morales-Hernandez has not been seen in town.  (<u>Id.</u>)

14       **c.**       **Statement of Luis Fernando Castellanos Salgado**

15       Mr. Salgado provided a sworn statement on December 15, 2011.  (ECF No. 17-1 at 86-
16 87.)  Mr. Salgado is thirty-one-years-old, married, and is a farmer.  (<u>Id.</u> at 86.)  On December 11,
17 2011, at 8:00 a.m., Mr. Salgado was filming the pilgrimage that was passing through the street of
18 Ninos Heroes in the town of Santiago Asuncion, Silacayoapam, Oaxaca.  (<u>Id.</u>)  Suddenly, the
19 decedent got his attention by honking the horn of his black Silverado pick-up truck that did not
20 have license plates.  (<u>Id.</u>)  Mr. Salgado went over and chatted with the decedent.  (<u>Id.</u>)  Mr.
21 Salgado noticed a navy-blue Ranger Ford truck with a white platform stop behind decedent's
22 truck.  (<u>Id.</u>)  Mr. Salgado saw the driver, Morales-Hernandez, who he knew as Lany, get out of
23 the truck with a shotgun.  (<u>Id.</u>)  At the same time, he heard his filming partner complaining
24 because he had stopped filming the band.  (<u>Id.</u>)  He turned around to go with the pilgrimage and
25 start filming when he heard Morales-Hernandez telling the decedent that they would settle it
26 once and for all and heard a shot.  (<u>Id.</u>)  Mr. Salgado turned around to see what had happened
27 and saw Moreno-Hernandez shoot the decedent again.  (<u>Id.</u> at 86-87.)  He heard four shots in
28 total.  (<u>Id.</u>)

1    Mr. Salgado went to look for the authorities who were escorting the pilgrimage. (Id. at

2    87.) Mr. Salgado was able to locate the mayor and informed him what had happened but did not

3    return to the truck because he was impressed by what had happened. (Id.)

### d.      Statement of Florencia Catalina Camacena Pizarro

5         On May 17, 2018, at 2:00 p.m., a photographic identification was initiated with Ms.

6    Camacena. (ECF No. 17-1 at 125-127.) Ms. Camacena is a 55-year-old widowed homemaker.

7    (ECF No. 125.) Ms. Camacena identified the individual that she believed took the life of her son

8    as Morales-Hernandez. (Id. at 126.) She had seen Morales-Hernandez prior to the December 11,

9    2011 incident, but has not seen him since the incident. (Id.) She stated that Morales-Hernandez

10   ran away after he deprived her son of his life. (Id.) She had seen him because he is from

11   Ixpantepec Nieves, and used to sell construction materials. (Id.) She would be able to identify

12   him in a photograph because he is from town, had a building materials shop, and was a councilor

13   of the town city council. (Id.) Ms. Camacena was shown a picture of Morales-Hernandez and

14   identified him as the person who probably deprived her son of his life. (Id. at 127.)

### e.      Investigative Report of Artemio Zarate Ramirez

16        At 9:20 a.m. on December 11, 2011, Mr. Ramirez received a phone call that a male

17   individual had been killed in Santiago Asuncion Silacayoapam. (ECF No. 17-1 at 90.) He went

18   to the site at 9:32 a.m. and met with Police Commander Raul Rene Ramirez; the crime scene had

19   already been cordoned off. (Id.) Mr. Ramirez proceeded to photograph the crime scene. (Id.)

20   He observed a street, Ninos Heroes, made of hydraulic concrete. (Id.) He observed three

21   burgundy colored metallic cases, 12 caliber, on the street. (Id. at 90-91.) By the right knee of

22   the decedent was a semiautomatic handgun, caliber 9 mm, that was covered in blood. (Id. at 91.)

23   An empty magazine was removed. (Id.) The black Chevrolet Silverado truck, with license

24   plates, had the keys inside and the engine was running. (Id.) There were several orifices in the

25   passenger side window. (Id.) A corpse was slumped over in the driver's side with an injury

26   measuring 10 cm in the right check. (Id.) In the left part of the head were four bodily injuries of

27   different sizes. (Id.) There were three circular bodily injuries in the left part of the back. (Id.)

28   The corpse had on a gold necklace with a trinket in the shape of a fang and the initials DAD.

(Id.)  The corpse had 6 $1.00 bills American, and 150 Mexican pesos.  (Id. at 92.)

Mr. Ramirez spoke with Ms. Camacena who identified herself as the decedent's mother. (Id.)  She stated that the decedent had left her house that morning at 8:00 a.m. driving his truck. (Id.)  He told her that he was going to Santiago Asuncion because he was participating in a basketball tournament.  (Id.)  He was accompanied by Mr. Bonilla who had got inside the vehicle some meters ahead.  (Id.)  About 20 minutes later, her nephew, Diego Armando Camacena Pizarro, and her son, Luis Ortiz Camacena, arrived at the house of her cousin where the celebration of the Virgin Guadalupe was taking place and told her to go see her son because he had been killed in Santiago Asuncion.  (Id.)  She arrived and saw that her son was in the driver's seat lying on his right side and waited for the authorities to arrive.  (Id. at 92-93.)  She had been told by Mr. Flores that when her son was injured Mr. Bonilla was inside the truck in the passenger seat.  (Id. at 93.)  Mr. Flores told her that Morales-Hernandez had shot her son several times with a shotgun while he was talking to Mr. Flores and waiting for the processional to clear. (Id.)  She was told that, after Morales-Hernandez had killed her son, he escaped in a navy-blue ranger truck with the bed painted white.  (Id.)

The body of the deceased was removed to conduct the legal identification and autopsy. (Id.)

### f.    Autopsy Report

At 4:00 on December 11, 2011, Casildo Perez Martinez conducted an autopsy on the body of the deceased.  (EF No. 17-1 at 96-98.)  Mr. Martinez determined that the decedent had died 8 to 9 hours prior to examination.  (Id. at 96.)  The decedent was found to have a wound that was characteristic of being produced by a firearm projectile on the left temporal bone; a wound in the right check; a wound in the posterior part of the left arm; a wound in the lower region of the left shoulder; and a wound in the left back lower region.  (Id. at 97.)

### g.    Death Certificate

A death certificate issued on February 1, 2012.  (ECF No. 17-1 at 102-103.)  The cause of death for Edgar Ortiz Camacena was listed as traumatic brain injury of laceration of brain matter secondary to a projectile shot by a firearm.  (Id. at 102.)

### h. Ballistics Report

On January 20, 2012, a ballistics report was issued finding that the three casings found at the scene were fired from the same .12-gauge shotgun. (ECF No. 17-1 at 105-107.)

### i. Criminalist Report

On January 24, 2012, an expert report was generated by Salatiel Sanchez Hilario. (ECF No. 17-1 at 109-116.) The time of death was established to be around 8:00 a.m. on December 11, 2011. (Id. at 111.) The wounds to the body and death were determined to be caused by a firearm projectile. (Id.) The decedent was found to have negative reaction of ethylic alcohol in the blood sample. (Id.) There was a negative reaction in the dorsal and palmar region of both hands of the decedent for lead and barium which are elements that are part of the firearm cartridges. (Id. at 112.) There was a positive reaction for nitrate products in the orifices located on the decedent's shirt indicating that the shots were discharged at a distance of less than one meter. (Id.) There was a negative reaction for nitrate products from the muzzle of the barrel or the chamber of the handgun found on the decedent. (Id.) Mr. Hilario determined that based on the location where the handgun was found it would not have been visible from outside the vehicle. (Id. at 112-113.)

4. <u>The Government has established that probable cause exists that Morales-Hernandez committed the charged offense</u>

The evidence in this matter establishes that on December 11, 2011, around 8:00 a.m., the decedent was shot and killed while in his vehicle. The autopsy and physical evidence at the scene establish these facts and Morales-Hernandez does not dispute them. Morales-Hernandez challenges whether the evidence submitted is sufficient to establish probable cause that he was the individual who shot the decedent.

Morales-Hernandez argues that numerous discrepancies, inconsistencies, and contradictions exist within the Government's evidence that undermine the competency and reliability of the statements. The basis of Morales-Hernandez argument is that if you examine the inconsistencies in the evidence it is apparent that no witness was present and witnessed the shooting. The Government responds that contrary to Morales-Hernandez's arguments, the

physical and medical evidence collected during the investigation corroborates the eyewitness statements.

In addressing Morales-Hernandez's argument the Court is guided by the limited purpose of the current proceedings. "[T]he country seeking extradition is not required to produce all its evidence at an extradition hearing and it is not [this court's] role to determine whether there is sufficient evidence to convict the accused." Quinn, 783 F.2d at 815. Probable cause is a "commonsense, nontechnical conception[] that deal[s] with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Ornelas v. United States, 517 U.S. 690, 695 (1996) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Probable cause exists where the known facts and circumstances are sufficient to warrant a person of reasonable prudence that the individual committed the act accused. Ornelas, 517 U.S. at 696. In determining whether probable cause exists, the Court does not weigh conflicting evidence and make factual determinations, but is only determining if competent evidence has been presented to support the belief that the accused committed the charged offense. Quinn, 783 F.2d at 815; Barapind, 400 F.3d at 750; In re Extradition of Santos, 795 F.Supp.2d at 989 n.12.

The credibility of the witnesses and the weight to be accorded to their testimony is solely within the province of the extradition judge. Quinn, 783 F.2d at 815. However, a lack of credibility is merely a weakness in the case and does not necessarily obliterate the evidence of probable cause. Man-Seok Choe v. Torres, 525 F.3d 733, 740 (9th Cir. 2008).

In this instance, the witness statements of the three witnesses that they were present at the scene and saw Morales-Hernandez exit his vehicle with a shotgun and shoot the decedent, when considered with the evidence collected at the crime scene, would be sufficient to establish probable cause. Morales-Hernandez argues that the inconsistencies in the witness statements and the physical evidence is enough to demonstrate that the witnesses were not present and, therefore, their statements are not competent evidence to support a probable cause finding. The Court finds that largely what Morales-Hernandez characterizes as inconsistencies in the reporting witness statements are the types of inconsistencies that will go to the weight that the trier of fact

1   should consider or arguments as to the interpretation of the evidence. The Court shall consider

2   the argument presented by Morales-Hernandez as to the specific inconsistencies identified.

3       Initially, the Court notes that much of Morales-Hernandez argument is based on his

4   assumptions of the meanings of statements made by the witnesses and his view of the evidence

5   which is at times not consistent with the evidence in the record. For example, citing to the

6   provisional arrest warrant, Morales-Hernandez argues that the murder occurred around 9:00 a.m.

7   and the police arrived shortly afterwards in support of his argument that it is not reasonable that

8   no eyewitnesses were located at the scene when the police arrived around 9:00. (ECF No. 16 at

9   23.) However, all the evidence in the record indicates that the murder occurred shortly after 8:00

10  a.m.

11      Ms. Camacena stated that her son left her home around 8:00 a.m. on the day that he was

12  killed. (ECF No. 17-1 at 92.) Approximately twenty minutes later, her nephew and her other

13  son arrived to tell her that her son had been killed. (Id.) Mr. Bonilla stated that he was a

14  passenger in the truck at about 8:00 a.m. when they were stopped by the processional and the

15  shooting occurred while they were waiting for the processional to pass. (Id. at 120.) Similarly,

16  Mr. Salgado stated that he was walking and filming the pilgrimage at approximately 8:00 a.m.

17  when the decedent honked his horn to get his attention. (Id. at 86.) While he was talking to to

18  the decedent, he saw Morales-Hernandez pull up and get out of the truck with a shotgun. (Id.)

19  Mr. Flores stated that he was drinking at about 8:10 a.m. and started following the brass band.

20  (Id. at 80.) He encountered the decedent when he reached the corner of Ninos Heroes and

21  Morales-Hernandez pulled up in a truck shortly after they started talking. (Id.) The time of

22  death was established to be around 8:00 a.m. on December 11, 2011. (Id. at 111.) Ms.

23  Camacena was informed that her son had been killed at approximately 8:20 a.m. and the other

24  evidence in the record demonstrates that the murder occurred between 8:00 and 8:20 a.m., not

25  around 9:00 a.m. as Morales-Hernandez contends.

26      Secondly, the Court rejects Morales-Hernandez request that the Court apply particular

27  scrutiny to all statements obtained by the Mexican authorities due to reports of widespread

28  corruption of law enforcement. The Court finds no evidence of corruption in reviewing the

1  evidence submitting by the Government and to the extent that Morales-Hernandez seeks to assert

2  humanitarian reasons against his extradition to Mexico such arguments are appropriately

3  reserved for the Secretary of State and is not the issue to be decided in this proceeding.

4       **a.**     **Ms. Camacena's Statement**

5       First, Morales-Hernandez contends that Ms. Camacena stated that she saw Mr. Bonilla

6  get into the decedent's truck at her house in direct contradiction to Mr. Bonilla's statement that

7  he got into the truck at his father's house which is a number of blocks away. The Court notes

8  that even if there are such inconsistencies in the documentation provided, it would be of no

9  consequence if there exists in the documents other sufficient competent evidence to support

10  probable cause. U. S. ex rel. Sakaguchi v. Kaulukukui, 520 F.2d 726, 728 (9th Cir. 1975).

11       In support of the argument that Ms. Camacena stated that she saw Bonilla get into the

12  truck, Morales-Hernandez references Ms. Camacena's statement to Officer Ramirez made on the

13  date of the murder. (See ECF No. 16 at 8-9.[8]) After processing the crime scene, Officer

14  Ramirez asked if anyone knew or could identify the corpse. (ECF No. 92.) Ms. Camacena's

15  statement is recorded as follows.

16  FLORENCIA [illegible] CAMACENA replied she did, and stated that he was her

17  son named EDGAR ORTIZ CAMACENA. She also stated that today, her
    aforementioned son had left his domicile approximately at 08:00 hours, driving

18  his truck. He told her he would go to Santiago Asuncion given that since
    yesterday, a basketball tournament was taking place there, and her son was

19  participating in it. **She noticed that her son was accompanied by the person
    she knows as ARMANDO BOLANOS BONILLA and by the nickname "El**

20  **Sapo", who got inside the truck some meters ahead.** Approximately 20
    minutes later, her nephew DIEGO ARMANDO CAMACENA PIZARRO and her

21  son LUIS ORTIZ CAMACENA arrived up to the house of my cousin HECTOR
    ORTIZ CAMACENA, where the celebration of the Virgin Guadalupe is taking

22  place, to tell her to go to see her son EDGAR because he had been killed in
    Santiago Asuncion. Thus she went with them to the place, where I arrived

23  minutes later, seeing that inside the truck she previously describe; there was her
    son EDGAR ORTIZ CAMACENA sitting in the driver's seat and lying on his

24  right side. She waited there until the authority listening to her arrived to their job.
    She knew through the versions of several persons who were there, that when her

25  son was injured, ARMANDO BOLANOS BONILLA was inside her son's truck
    in the copilot's seat. Such information was given to her by RAUL REYES

26  FLORES who is an authority in that community. He stated that ESTANISLAO
    FLORENCIO MORALES HERNANDEZ was the person who using a shotgun,

27

<hr>

[8] Although the parties refer to the documents as B.S. 92, the Court references the numbers in the upper right hand

28  corner in the ECF system.

shot several times her deceased son when he was talking to Raul Reyes and waiting for the brass band which was playing along that street, to move. And that after he killed her son, he escaped in a navy-blue truck ranger type, with the bed painted in white.

(ECF No. 17-1 at 92-93 (emphasis added).)

While Morales-Hernandez argues that Ms. Camacena stated that she saw Mr. Bonilla get into her son's truck at her house, the Court does not find that that accurately represents her statement. Ms. Camacena stated that she noticed that her son had Mr. Bonilla with him at about 8:00. While she stated that Mr. Bonilla had "got into the truck some meters ahead", she never stated that she saw Mr. Bonilla get into the truck.

Mr. Bonilla stated that the decedent picked him up at his father's house at 7:45 a.m.[9] (ECF No. 17-1 at 75.) Ms. Camacena's statement that Mr. Bonilla "got into the truck some meters ahead" would be consistent with Mr. Bonilla being picked up prior to the two of them arriving at Ms. Camacena's house. Therefore, the Court does not find that Ms. Camacena's statement is inconsistent with Mr. Bonilla's statement that the decedent picked him up at his father's house. Ms. Camacena's statement that she saw Mr. Bonilla in the truck with her son shortly before he was killed is competent evidence to suggest that Mr. Bonilla was with the decedent at the time of his death.

Morales-Hernandez also takes issue with Ms. Camacena's May 17, 2018 statement during the photo identification. He contends that she is not credible because the statement says that she witnessed the aggravated homicide on her son and was asked to identify him. (ECF No.17-1 at 127.) However, while the report states that she witnessed the homicide, she did not make any statements that indicated that she was present at the time of the killing or that her identification was based on that day. Ms. Camacena's statements on May 17, 2018 do not conflict with her prior testimony on the date of the murder that she had been told by Mr. Flores that Moreno-Hernandez had shot and killed her son. Ms. Camacena stated that she knew who Moreno-Hernandez was because he was from Ixpantepec Nieves and used to sell construction

---

[9] The Government argues that Mr. Bonilla never actually stated that he was picked up at this father's house. But Mr. Bonilla did state that he was at his father's house and the decedent arrived in his black truck. (ECF No. 17-1 at 75.) Mr. Bonilla stated that he went in the truck, (id.), therefore, the Court does find that Mr. Bonilla's statement is reasonably construed to mean that he got into the decedent's truck at his father's house.

1  materials.  (Id. at 126.)  The Court does not find that Ms. Camacena's 2018 statement would

2  explain away her prior statements or the statement of any other witness in this matter.

3      At the March 5, 2019 hearing, Morales-Hernandez argued that there is a family feud

4  between his family and the decedent's family.  He asserted that Ms. Camacena has a motive to

5  collude with the alleged witnesses to fabricate the evidence against him.  However, even

6  accepting as true that there is bad blood between the two families, it does not obliterate the

7  evidence against Morales-Hernandez but goes to the credibility of Ms. Camacena.  While the

8  Court can consider the credibility of the testimony, the extraditee does not have the right to pose

9  questions regarding credibility as he would in an ordinary trial.  Eain, 641 F.2d at 511.

10  "Evidence that conflicts with that submitted on behalf of the demanding party is not permitted,

11  nor is impeachment of the credibility of the demanding country's witnesses."  Matter of

12  Extradition of Mainero, 990 F.Supp. at 1218.

13      **b.    Mr. Flores Statements**

14      Morales-Hernandez contends that since Mr. Flores was not interviewed until 1:15 on

15  December 11, 2011, approximately five hours after the shooting, and his initial statement

16  neglected to mention the presence of any other witnesses, his statement is not credible.  In his

17  statement on the date of the murder, Mr. Flores stated that after the shooting he went to find the

18  people that were with the processional to inform them of what had occurred.  (ECF No. 17-1 at

19  80.)  No one wanted to return with him to see what had happened so he stayed with the people

20  until he saw that the authorities had arrived and then returned.  (Id. at 80-81.)  The police had

21  him go with them to take his statement.  (Id. at 81.)

22      To the extent that Morales-Hernandez contends that Mr. Flores was not present when the

23  police arrived and his statement was not given until five hours after the shooting, the Court does

24  not consider this to detract from his credibility or probable cause.  Mr. Flores left the area and in

25  his December 15, 2011 statement he confirmed that he went to inform the people who were with

26  the processional.  (ECF No. 17-1 at 83.)  It does not seem unreasonable for Mr. Flores to head in

27  the direction of other people to report what had just occurred.  Further, Mr. Flores returned to the

28  scene once there were other people at the site.  Given that he had just witnessed a friend being

murdered and had the murderer point the weapon at himself, it would not imply a lack of credibility on his part to desire to be with other people, rather than alone with the corpse, while waiting for the police to arrive.

Further, any delay in taking Mr. Flores formal statement, assuming that delay exists, would be the type of evaluation of the criminal procedures of the requesting jurisdiction that are beyond the purview of this court. See Santos, 830 F.3d at 1039 (a judge may not entertain challenges that a requesting country has not followed its own laws in bringing a criminal case or extradition request); Skaftouros v. United States, 667 F.3d 144, 156 (2d Cir. 2011) (principles of international comity and judicial modesty restrain extradition courts from deciding most questions of foreign law and procedure).

Morales-Hernandez also argues that since Mr. Flores original statement left out significant information, such as the presence of other witnesses, and that he later changed information previously provided, the number of shots fired, his statement should be found to be not credible.

In his initial statement to the investigating officers, Mr. Flores stated that Morales-Hernandez started shooting the decedent with this rifle. (ECF No. 17-1 at 80.) He fired three shots and, when he saw the decedent did not move anymore, he turned to Mr. Flores and pointed the rifle at him. (Id.) While Mr. Flores stated that three shots were fired, it is not clear that he was stating **only** three shots had been fired. When viewing the statement in its entirety, and comparing it to his subsequent statement, they are not clearly inconsistent. In his second statement, Mr. Flores stated that Morales-Hernandez fired one shot that grazed the decedent's cheek. (ECF No. 17-1 at 83.) After the decedent bent to the right, Morales-Hernandez fired three more shots putting the gun closer to the decedent's body. (Id.) The initial statement that Morales-Hernandez started firing is consistent with the second statement that a single shot was fired grazing the decedent's cheek. Then three more shots were fired into the decedent's body at a closer range. Viewing the two statements together, the Court does not find the number of shots reported to be clearly inconsistent.

Morales-Hernandez also argues that the fact that Mr. Flores added the information about

other individuals being present during the shooting and that the shooter also threatened the other occupant of the truck detracts from his credibility. Initially, Mr. Flores statement left out the fact that other individuals were present during the shooting and that Morales-Hernandez had threatened a passenger in the truck. However, again the Court does not find that the failure to mention these facts during the initial interview on the date of the shooting is so significant that it would obliterate probable cause.

There is no indication that Mr. Flores was asked if there were any other witnesses present and denied that anyone else was present. While in hindsight Morales-Hernandez can argue that this would be an important fact that should have been reported to the authorities, Mr. Flores had just seen a friend gunned down in cold blood and the killer had threatened to kill Mr. Flores as well. It might be that the fact that he could have been killed also weighed so heavily on him that the fact that others were present carried no significance in the moment. The fact that Mr. Flores added to his story later is the type of evidence that can be argued to the trier of fact to impeach Mr. Flores' credibility, but does not obliterate probable cause in this instance.

Further, Mr. Flores second statement is consistent with what Ms. Camacena reported that he told her on the date of the shooting. Ms. Camacena told the authorities that she had learned from Mr. Flores that her son had been shot by Morales-Hernandez while he was talking to Mr. Flores and that Mr. Bonilla had been in the truck with him at the time. (ECF No. at 93.)

Finally, Morales-Hernandez argues that the signatures on the two statements provided by Mr. Flores are visibly different. While there are some differences in the signatures on the documents, the Court cannot find that apparent differences in the signatures alone would obliterate probable cause.

In his initial statement, Mr. Flores stated that he was speaking with the decedent while waiting for the processional to pass and observed Morales-Hernandez pull up behind the decedent's vehicle. He saw Morales-Hernandez exit his vehicle with a shotgun, and after exchanging words with the decedent, he observed Morales-Hernandez fire the shotgun, killing the decedent. Mr. Flores statement, along with the physical evidence from the scene of the crime, is sufficient for the Court to find probable cause exists to believe that Morales-Hernandez

committed the crime charged.

###### c. Consistencies in the Statements of Mr. Flores, Mr. Bonilla, and Mr. Salgado

Morales-Hernandez argues that since Mr. Salgado, Mr. Flores and Mr. Bonilla reported the identical statements of the shooter there is reason to believe that the exchange was fabricated. Further, Morales-Hernandez argues that since all three stated that the decedent's truck did not have a license plate, and it did, this strongly suggests that they fabricated or concocted the statements together.

First, as to the statement that the decedent's truck did not have a license plate, Morales-Hernandez states that this is especially important because it shows that the three concocted their statements in this case. However, although the vehicle had a license plate on the back, it did not have a front license plate. (See ECF No. 21-1 at 66, 71.) Therefore, the statement that the vehicle did not have a license plate is not so inconsistent with the evidence that it causes the Court to infer that the witnesses concocted their statements in this matter.

As to the consistency of the witness statements, Mr. Flores originally stated that Morales-Hernandez stated, "WHY EVERY TIME YOU PASS IN FRONT OF MY HOUSE YOU FIRE SHOTS? NOW LET'S SETTLE THIS!"[10] (ECF No. 17-1 at 80.) In his second statement, Mr. Flores said that Morales-Hernandez told the decedent, "MEGA (sic) BECAUSE EVERY TIME YOU DRINK, YOU ALWAYS SHOOT BY MY DOOR." "DO WE FIX IT OR WHAT DO WE DO?" (ECF No. 17-1 at 83.) The decedent answered: "OK."[11] (Id.) Morales-Hernandez told Mr. Bonilla that he was going to get fucked and aimed the rifle at him. (Id.) Mr. Bonilla said that he had no problem with him and asked Morales-Hernandez not to kill him and to let him go. (Id.) Morales-Hernandez told him to get down and to go to hell motherfucker. (Id.)

Mr. Bonilla stated that Morales-Hernandez said, "MEGA, WHY EVERY TIME YOU DRINK YOU SHOOT AT MY DOOR?" Morales-Hernandez also said, "ARE WE GONNA

---

[10] The original document states, "PORQUE CADA VEZ QUE PASAS FRENTE A MI CASA ECHAS TIROS, AHORA VAMOS A ARREGLAR ESTO." (ECF No. 17-1 at 217.)

[11] The original document states, "MEGA, PORQUE CADA QUE TOMAS SIEMPRE ECHAS TIROS EN Ml PUERTA" y ademas le dijo: "LO ARREGLAMOS O QUE" par lo que EDGAR ORTIZ CAMACENA le contesto "SALE." (ECF No. 17-1 at 220.)

FIX THIS OR WHAT?" The decedent answered, "ALRIGHT".[12] (ECF No. 17-1 at 76.) After Morales-Hernandez shot and killed the decedent, he pointed the gun at Mr. Bonilla and said, "YOU ARE FUCKED TOO". (Id.) After Mr. Bonilla asked Morales-Hernandez not to kill him, he said, "ALRIGHT. GET THE FUCK OUT OF HERE." (Id. at 77.)

Mr. Salgado testified that as he was turning around to go back to the pilgrimage, he heard Morales-Hernandez telling the decedent that they would settle it once and for all and heard a shot.[13] (ECF No. 17-1 at 86.)

While the second statement of Mr. Flores and Mr. Bonilla's statement do use substantially the same language in recounting Morales-Hernandez's statement, there are also slight differences. The Court finds that there is not such identical language between the three witness statements that it shows evidence of collusion. First, as to the language that Morales-Hernandez argues is identical, Mr. Flores second statement is consistent with the first statement that he provided. On the date of the shooting, Mr. Flores stated that when Morales-Hernandez approached with the shotgun in his hands, Morales-Hernandez said to the decedent, "WHY EVERY TIME YOU PASS IN FRONT OF MY HOUSE YOU FIRE SHOTS? NOW LET'S SETTLE THIS!" (ECF No. 17-1 at 80.) In his second statement, Mr. Flores said that Morales-Hernandez said, "MEGA (sic) BECAUSE EVERY TIME YOU DRINK, YOU ALWAYS SHOOT BY MY DOOR." "DO WE FIX IT OR WHAT DO WE DO?" (Id. at 83.) The substance of Mr. Flores first statement is substantially identical to the substance of his second statement. Therefore, no inconsistency exists that would explain away or obliterate probable cause.

Further, the substance of the statements of all three witnesses is the same and there is no indication that the statements were concocted after the fact to accuse Morales-Hernandez of a crime he did not commit. Mr. Flores and Mr. Bonilla both stated that Morales-Hernandez accused the decedent of shooting at his house when he was drinking and said that they were

---

[12] The original document states, ""MEGA, PORQUE CADA QUE TOMAS SIEMPRE HECHAS TIROS EN MI PUERTA" y ademas le dijo: "LO ARREGLAMOS O QUE" y EDGAR ORTIZ CAMACENA le contesto "SALE." (ECF No. 17-1 at 211.)

[13] The original documents states, "que si arreglaban eso de una vez…." (ECF No. 17-1 at 224.)

going to resolve the issue after which Morales-Hernandez shot and killed the decedent. Mr. Salgado stated that he heard Morales-Hernandez say they were going to fix this after which he heard and saw Morales-Hernandez fire the shotgun at the decedent. Morales-Hernandez has presented no evidence that the witnesses in this matter colluded to falsely implicate him in the murder and the fact that two of the witnesses used identical language in recalling what the shooter said to the decedent is not by itself evidence of collusion. See In re Extradition of Figueroa, No. 12-M-269, 2013 WL 3243096, at *8 (N.D. Ill. June 26, 2013) (rejecting similar argument as based on pure speculation and insufficient to negate a probable cause finding). The statements of these witnesses, along with the evidence from the crime scene, are sufficient to find that probable cause exists to believe that Morales-Hernandez committed the crime alleged.

### d. Delay in Identifying Witnesses

Morales-Hernandez argues that the fact that none of the three purported witnesses stayed at the site of the shooting to talk to the police raises doubts about whether they were actually present when the shooting occurred. First, as discussed above, this argument is unpersuasive as to Mr. Flores testimony because he did stay in the area and returned once the police showed up to provide a statement.

As to the remaining two witnesses, Morales-Hernandez argues that it is not credible to believe than an individual who was the witness of the scene of a murder would not stay to give a statement to the police. Mr. Bonilla stated that after he was told to get out of there by Morales-Hernandez, he returned after Morales-Hernandez left to see if the decedent was alive, but he was dead. (ECF No. 17-1 at 77.) Mr. Salgado stated that he went to look for the authorities who were escorting the pilgrimage to tell them what had happened and was able to inform the mayor. (ECF No. 17-1 at 87.) He did not return to the truck because he was "impressed" by what had happened. (Id.)

Although Morales-Hernandez states that it is not credible to believe that no witness to the shooting could be found when officers arrived on the scene, it is common knowledge that, even in the United States, individuals who witness such crimes often do not stay to talk to police. This is demonstrated by public service announcements that are broadcast and published seeking

witnesses to criminal activity. Even those who are friends or relatives of the victim may have reasons of their own for not wanting to get involved. The Court finds the argument that no friend of a victim or individual who witnesses the crime would leave the scene without providing a statement to authorities to be particularly unpersuasive.

### e. Physical Evidence at the Scene

Morales-Hernandez argues that the physical evidence at the scene shows that there was no one in the passenger seat of the truck when the decedent was shot. In support of this argument, Morales-Hernandez points to specific photographic evidence that he states proves that the passenger seat was not occupied at the time of the shooting. Morales-Hernandez argues that the photographs of the passenger side of the vehicle show that no one was present in the vehicle at the time of the shooting. Morales Hernandez contends that, due to the extent of damage to the window, a passenger in the vehicle would have been either injured by the shotgun blast or covered in blood and particulate matter, and the passenger seat would not have blood and particulate matter if a passenger was seated in the vehicle. Morales-Hernandez also argues that the passenger door was shut when police arrived and it defies common sense that Mr. Bonilla would have shut the door had he exited the vehicle after the incidents that are alleged.[14] Further, Morales-Hernandez argues that given the extent of damage to the window, it seems unlikely that the window would have remained intact had the door been opened and closed.

In his opposition, Morales-Hernandez refers to pictures included in his expert report. The Court shall consider the pictures of the vehicle for the purposes of determining if probable cause exists. The passenger window of the vehicle has a fairly large hole in the center of the window with what appear to be four small holes, two toward the top of the large hole and two at the bottom of the large hole, toward the back of the window; one small hole just above the large hole, and at least two small holes at the front of the window. (ECF No. 21-1 at 9, 36, 72, 126, 159.) However, the picture shows that there is a substantial portion of the window that remains

---

[14] The Court finds that Morales-Hernandez arguments regarding what "common sense" indicates that someone would do in the situation addressed here has no persuasive value. There is no "common sense" reaction to witnessing someone being gunned down in cold blood. While we might speculate that we would have responded differently, the Court finds that a common sense approach is not a reliable indicator of how any individual should have reacted after witnessing a traumatic event.

intact.  Officer Ramirez observed at the scene that there were several orifices in the passenger side window.  (ECF No. 17-1 at 91.)  In the arrest warrant it is noted that Mr. Hilario inspected the vehicle on December 15, 2011.  (Id. at 30.)  He noted "the right door crystal was totally broken, the plastic frame of the right door bears two irregular orifices as well as the internal part of the right side mirror base and the internal plastic of the door."  (Id. at 31.)  The judge considered the photographs of the vehicle which showed "the right crystal totally broken and several orifices."  (Id. at 43.)

The Court notes that the passenger door was opened at one point during the investigation for photographs to be taken of the inside of the vehicle while the decedent was still seated in the driver's seat.  (Id. at 89, 90.)  Morales-Hernandez argues that the crime scene photographs show that the passenger window was shattered.  (ECF No. 21-1 at 10.)  Morales-Hernandez has not presented any evidence addressing when or how the window was ultimately shattered.  While the fact that the window shattered at some time after the shooting raises a question as to whether the window would have shattered the first time that the door was opened or if the window weakened with each time it was closed, this alone is not sufficient to explain away Mr. Bonilla's presence at the scene but merely calls into question the Government's evidence.

Morales-Hernandez also argues that the seat of the vehicle was covered with blood spatter; and therefore, it demonstrates that no one was sitting in the passenger seat.  In support of this argument, Morales-Hernandez references a crime scene photograph that appears to show some blood spatter on something within the vehicle.  (ECF No. 12-1 at 57.)  It is unclear if Morales-Hernandez is contending that the photograph shows blood spatter on the seat of the vehicle.  However, viewing the photographs which show the seat of the vehicle, (id. at 39, 49, 50, 53, 54, 55, 74, 75, 85, 86, 89, 90, 91, 96-102, 104-106), the item in the photograph is not consistent with the fabric, texture, or contour of the seats in the vehicle.[15]  The Court finds that this appears to be a picture of something in the interior of the vehicle, but not the seat.  To the extent that Morales-Hernandez references this picture to demonstrate that there was blood spatter

---

[15] Morales-Hernandez expert report appears to state that this is a photograph of the ceiling of the vehicle.  (ECF No.16-2 at 53-54.)

within the vehicle, the Court finds that none of the pictures of the passenger side seat of the vehicle show blood spatter which would be inconsistent with a passenger being in the vehicle at the time of the shooting.

Morales-Hernandez argument is largely conjecture and speculation as to what might have occurred had Mr. Bonilla been seated in the passenger seat. Morales-Hernandez argues that had a passenger been sitting in the passenger seat he would have been injured by the shotgun blast or at a minimum covered in blood and particulate matter. However, Morales-Hernandez also acknowledges that Mr. Bonilla was not present when law enforcement officers arrived and was not interviewed until four days later. So, there is no evidence of whether or not Mr. Bonilla had blood and particulate matter on him on the day of the shooting. Further, the testimony of the witnesses was that after Morales-Hernandez fired the first shot that grazed the decedent's check, the decedent bent to the right and Morales-Hernandez moved closer to the body and fired additional shots at close range. (ECF No. 17-1 at 83.) The expert found that the decedent's head was bent toward the west at the moment of the first shot and the that his trunk turned toward the right as he continued to be shot.[16] (Id. at 114.)

Morales-Hernandez also argues that there was a jacket on the seat of the vehicle that had blood and particulate matter and it would not have such if there had been a passenger in the vehicle. Again, Morales-Hernandez presents no evidence regarding where the jacket was located at the time of the shooting. The jacket could have been on the seat between the decedent and Mr. Bonilla or even in Mr. Bonilla's lap at the time of the shooting in which case blood and particulate matter would be expected to have been found on the jacket.

The Court has carefully reviewed the photographs provided by Morales-Hernandez and finds that there are no images that would demonstrate that a passenger could not have been present in the vehicle at the time of the shooting. Morales-Hernandez has failed to present evidence that would explain away or obliterate the Government's evidence of probable cause.

/ / /

---

[16] The Court also notes that the expert report submitted by Morales-Hernandez indicates that there were no exit wounds in the decedent's body, (ECF No. 16-2 at 54), so it would appear that the decedent blocked the majority of the shotgun blast from the passenger side of the vehicle.

###### f. Lack of Physical Evidence Tying Morales-Hernandez to the Crime

Morales-Hernandez argues that although the witnesses all stated that he arrived on the scene in a navy-blue truck there is no evidence that he owned such vehicle. Further, Morales-Hernandez argues that there is no evidence that he owned a shotgun or that the three shell cases contained fingerprints belonging to him.

"[T]he country seeking extradition is not required to produce all its evidence at an extradition hearing and it is not our role to determine whether there is sufficient evidence to convict the accused." Quinn, 783 F.2d at 815; Cohen, 374 F.Supp.2d at 856. Despite Morales-Hernandez arguments, there is no requirement that there be physical evidence linking him to the murder for probable cause exist to believe that he committed the crimes charged. Here, there were three witnesses who stated that they knew Morales-Hernandez and saw him get out of the vehicle and shoot the decedent. The witness statements are consistent with the physical evidence found at the scene of the murder, including the decedent's body in the vehicle, the wounds consistent with the witness testimony, and the shell casings found in the vicinity of the vehicle. Competent evidence exists by which the Court finds there is probable cause to believe that Morales-Hernandez committed the offense charged.

###### g. Elephant in the Room Argument

Morales-Hernandez argues that the issues with the Government's evidence here is similar to the situation in In re Extradition of Strunk, 293 F.Supp.2d 1117 (E.D. Cal. 2003), in which Judge Hollows analogized the presentation of explanatory evidence to an elephant in the room. 293 F.Supp.2d at 1122. "At some point, the 'elephant' cannot be ignored. Inconsistent evidence may cause the 'elephant' to grow to such proportions that no reasonable person or jurist would find it likely (as opposed to merely suspicious) that Strunk was complicit in his wife's murder." Id.

The Republic of the Philippines sought the extradition of Strunk for the murder of his wife. In re Extradition of Strunk, 293 F.Supp.2d at 1119. Strunk's wife, a well-known and popular actress, was found murdered in her car in the parking garage of her office building and Medel confessed to the crime and implicated Strunk as the instigator of the murder. Id. at 1123.

1    Medel later recanted his confession stating that it had been obtained through coercion and

2    torture.  Id  In his original confession, Medel claimed that a third party, Martinez, had recruited

3    him for a job on the wife of "a Chinese who swindles."  Id. at 1124.  They made arrangement to

4    rendezvous at a specific location.  Id.  Medel was picked up by a man with Caucasian features,

5    Rad (Strunk), who told him to get in the car and they drove around for several hours but never

6    found the subject.  Id.  Medel stated that he was dropped off in a parking garage and told to wait

7    in a car.  Id.  Around 1:00 a.m., a car containing two women and Rad drove into the parking lot.

8    Id.  They parked next to the car that Medel was in and all three of them exited the car.  Id.  Rad

9    and the woman attacked the victim and pushed her into the car with Medel.  Id.  Medel attacked

10   her also, eventually stabbing her with his knife in the left side and neck.  Id.  The three of them

11   left the garage and Medel was dropped off at his home where he hid the knife under his kitchen

12   sink.  Id. at 1124-25.  He only found out who the victim was a couple of days later.  Id. at 1125.

13        Medel gave a second statement in which he stated that at first he believed that Martinez

14   had planned the crime but later found out that another person, Rad, along with two others were

15   the masterminds.  Id. at 1125.  Medel had no regrets except regarding who the victim was.  Id.

16        The court found that the inconsistencies in the two statements showed that Medel

17   embellished what was initially said to make the case better.  Id.

18        In the first confession, it is evident that Medel had never personally met Strunk
         until right before the murder, but by the very next day of the second statement,
19       Medel "later found out that another person whom I was able to personally meet
         and of whom I have identified as RAD, a caucasian with two (2) others were the
20       mastermind" for the murder of a person he supposedly did not know at the time.
         Going from Medel not knowing Strunk, to Medel knowing that Strunk was the
21       mastermind—all in the space of a day according to the two statements—would
         give pause to any reader, and gives impetus to the idea that Medel was being fed
22       facts.

23   Id.  Giving a further body blow was the fact that Medel received compensation for his family by

24   giving his confession.  Id.

25        Several days after the second confession, Medel dramatically repudiated his prior

26   confessions.  Id. at 1126.  He stated that the first two confessions were obtained by torture, that

27   he did not know Strunk, and denied participating in the murder.  Id.  The court wondered

28   whether any of Medel's statements could be believed.  Id.

The court also considered other evidence submitted by the Philippines in support of the request for extradition. Id. at 1127. There were two sworn statements from witnesses whose statements differed from Medel's in several significant respects. Id. The first witness, Gonzaga, stated that Medel knew Strunk well prior to the night of the murder and that Medel had been hired for the express purpose of killing the victim and he knew who the intended victim was and that Medel had tried to recruit others to participate in the murder. Id. Gonzaga gave three separate statements over a period of time. Id. at 1128-29. In each statement Gonzaga elaborated on his previous statement and contradicted prior statements. Id.

There were also several declarations of a third individual, Pates, which contradicted the Gonzaga declarations. Id. at 1129. The court found that the important aspect of Gonzaga and Pates statements were not the contradictory statements included but that they completely shattered Medel's statements that he did not know Strunk prior to the day of the murder. Id. The court stated that if Medel could not be believed regarding not knowing Strunk or the intended victim, why should he be believed regarding Strunk's complicity. Id. Further, the court found that Gonzaga's statements as a whole were implausible. Id. at 1129-31. The court also found that other aspects of the evidence presented by the Philippines was inconsistent, such as that the date that Medel was alleged to have contacted authorities to surrender varied from declarant to declarant and a joint counter affidavit by four individuals contradicted the statements of Gonzaga and another witness. Id. at 1131. The remaining evidence in the extradition package did little to connect Strunk to the crime. Id. at 1132-33. The court found that it could not ignore the implausibility's and inconsistencies in the evidence submitted by the Philippine government. Id. at 1133.

Finally, the court found that evidence submitted by Strunk completely obliterated the essential part of Medel's confession. Id. at 1133. Evidence that Strunk was at home on the evening of the murder completed refuted any notion that he had been with Medel during the evening. Id. at 1138. Finally, the court watched a video of where the police found the knife that was allegedly used in the killing and it was not hidden under the kitchen sink as Medel had stated but was found in an open part of the kitchen and the knife tested negative for human DNA. Id. at

1 | 1138-39.

2 |     The court held that the evidence submitted by the Philippines concerning Strunk's

3 | participation in the murder was so inconsistent and conflicting that it provided little competent

4 | evidence to support that Strunk had hired Medel to kill his wife and the evidence submitted by

5 | Strunk obliterated the case that rested on Medel's confession.  Id.

6 |     The Court is unpersuaded by Morales-Hernandez' assertion this case is similar to that of

7 | Strunk.  Here, even accepting as true that there are several inconsistencies in the evidence

8 | presented by the Government, unlike in Struck, the witness statements in this case are consistent

9 | that Morales-Hernandez was the individual who shot the decedent and the record does not raise

10 | inconsistencies or conflicts that would explain away or obliterate the governments' evidence.

11 |     First, although Morales-Hernandez argues that Mr. Bonilla was not in the truck during

12 | the shooting, Ms. Camacena stated that she saw Mr. Bonilla in the truck with her son at about

13 | 8:00 on the morning of his death.  This is competent evidence to support that Mr. Bonilla was in

14 | the vehicle shortly afterward when the decedent was shot.  Second, while Morales-Hernandez

15 | argues that Mr. Bonilla, Mr. Flores, and Mr. Salgado were not present when the decedent was

16 | shot, he has not presented any actual evidence to support the argument.

17 |     Ms. Camacena, Mr. Bonilla, and Mr. Flores all stated that the decedent was in his truck,

18 | along with Mr. Bonilla, heading to Santiago Asuncion to participate in a basketball tournament.

19 | The incident occurred in Santiago Asuncion where the decedent's vehicle had stopped to wait for

20 | a procession to pass.  Mr. Bonilla, Mr. Flores, and Mr. Salgado all stated that they saw Moreno-

21 | Hernandez pull up in a navy-blue truck and get out of the vehicle carrying a shotgun.  All three

22 | witnesses stated that Moreno-Hernandez verbally confronted the decedent and stated that he was

23 | going to fix this at which time he shot the decedent four times.  Moreno-Hernandez has not

24 | presented any evidence or argument that would explain away or completely obliterate these

25 | witness statements.

26 |     Even though Mr. Flores was the only witness who stayed to talk to the police after

27 | witnessing the murder, the statements of the witnesses are not inconsistent as to what occurred.

28 | Further, the physical evidence at the scene confirms that the decedent was shot while seated in

his vehicle at the location where the three witnesses stated the incident occurred. The evidence also confirms that the decedent was shot four times with a shotgun as all the witnesses testified. Ballistics reports confirmed that the shots were fired from a single shotgun.

While Morales-Hernandez points to weaknesses in the Government's case, such as Mr. Flores' signature appearing to be different on the statements in the record, Mr. Flores added information in his second interview, the shattered passenger side window, or that two of the witnesses were not interviewed until four days later, these weaknesses do not invalidate all of the Government's evidence for the purpose of determining probable cause in this extradition proceeding. In re Salazar, No. 09MJ2545-BLM, 2010 WL 2925444, at *11 (S.D. Cal. July 23, 2010). The Court finds that the Government has submitted competent evidence by which probable cause exists to believe that Morales-Hernandez committed the homicide of the decedent.

**h.    Undue Advantage**

Finally, Morales-Hernandez asserts that extradition is barred because the Government has failed to provide competent evidence that the murder was carried out with undue advantage. Morales-Hernandez contends that the chemical evidence is not to be believed because the evidence would not have been preserved due to the manner in which the testing was conducted. Morales-Hernandez argues that due to the autopsy and the handling of the body any evidence that the decedent used his gun would have been destroyed. Therefore, the expert reports are not credible evidence that the shooter had an unfair advantage. Morales-Hernandez also contends that there is strong circumstantial evidence to demonstrate that the decedent had been drinking heavily the night prior to the murder, was about to begin drinking, or was drinking at the time of the shooting.

The Government counters that there is more than sufficient evidence to demonstrate that Morales-Hernandez committed the homicide with the aggravating circumstance of unfair advantage. The Government points to the opinion of Constitutional Rights Judge Leon who found that Morales-Hernandez use of the shotgun made him stronger than the victim due to the weapon used and that the crime scene reconstruction showed that Morales-Hernandez would not

have seen that the decedent had a gun in the vehicle. Further, the Government argues that there is no evidence that the decedent reached for the handgun or made a hostile move that would have made Morales-Hernandez aware of the presence of the handgun or that the handgun was used.

Article 17 of the treaty provides that "[a] person extradited under the present Treaty shall not be detained, tried or punished in the territory of the requesting Party for an offense other than that for which extradition has been granted." 31 U.S.T. 5059. Here, extradition is sought for the charge of aggravated homicide with unfair advantage. (ECF No. 17-1 at 3-12; 69-70.) Under Article 301, as relevant here, unfair advantage exists "when the perpetrator is stronger due to the weapons used, due to greater skill with those weapons or by the number of persons accompanying. . .." (Id. at 73.)

In issuing the arrest warrant in this matter, Judge Leon found that the element of unfair advantage existed because Morales-Hernandez used a firearm in the commission of the homicide. (Id. at 56.) Judge Leon found that this had been proven by the statements of the witnesses who observed the crime and the report of the forensic experts. (Id. at 57.) Judge Leon stated that to satisfy the charge of unfair advantage two aspects must be shown, an objective and a subjective aspect. (Id. at 59.) First, to satisfy the objective aspect, it must be shown that the perpetrator was stronger which is shown 1) where the perpetrator is stronger than the victim and the victim is unarmed; 2) when the defendant is stronger due to the weapon he uses, or by his greater skill on those weapons, or by the persons who accompany him; 3) when the perpetrator weakens the victim's defenses by any means; or 4) when the victim is fallen or defenseless and the offender is armed or on his feet.[17] (Id.) Unfair advantage is not considered in the first three situations where the perpetrator is legitimately justified in using self-defense nor is it considered in the fourth instance where the perpetrator's life would have been endangered had they not

---

[17] In his opposition, Morales-Hernandez requested that the statute be provided in its entirety at the hearing as the excerpt provided cuts off after the word accompanying. The Government replies that the text of the statute is recorded in its entirety in the arrest warrant issued by Judge Leon making the request moot. Morales-Hernandez did not address this issue during the March 5, 2019 hearing.

The Mexican government provided the relevant portion of the statute under which the undue advantage was found in the warrant. Further, Article 301 is set forth in its entirety in the arrest warrant issued by Judge Leon. (ECF No. 17-1 at 59.)

taken advantage of the unfair advantage. (Id.)

In this case, Morales-Hernandez was found to have used unfair advantage because he used a 12-gauge shotgun and it was evident that this was a superior weapon to the 9-mm handgun that the decedent carried. (Id.) The Court found this was especially true since the handgun that the victim carried was not loaded. (Id.) See also In re Salazar, No. 09MJ2545-BLM, 2010 WL 2925444, at *12-13 (S.D. Cal. July 23, 2010) (finding that unfair advantage is an element of the crime and addressing the objective and subjective components).

The subjective component requires that the perpetrator be aware or fully convinced of the unfair advantage in relations to the victim. (Id.) This means that the perpetrator must be fully sure that the victim did not have, at any time, the opportunity to attack him, and this can be proven through circumstantial or inferential evidence. (Id. at 59-60.) Judge Leon found that Morales-Hernandez was indeed aware of such advantage for the following reasons. First, based on the expert opinion of Mr. Hilario, an expert in criminalistics, that due to the position of Morales-Hernandez he could only see the decedent's upper chest and was unable to see the handgun by the decedent's upper leg. (Id. at 60.) Judge Leon found that because the evidence established that Morales-Hernandez was unable to see the handgun he knew that he was not at a risk of dying from an injury caused by the decedent. (Id.) Further, there was no evidence that Morales-Hernandez repelled any action that put him in danger. (Id.)

Morales-Hernandez notes that the report of the chemistry expert, Mr. Ruiz, was not provided in these proceedings and takes issue with the summary report in the record. Specifically, as to the findings that the decedent did not have alcohol in his blood, that his hands revealed a negative reaction for nitrates, and that the handgun had not been fired. The report of Mr. Ruiz is set forth in the arrest warrant issued by Judge Leon. (Id. at 30.) The warrant states,

> Expert opinion dated December 15, 2011 on the triggering time of the handgun, trademark Star, Spanish manufacture, registration number 1801587, signed by the expert on chemistry from the Attorney General of the State, Jose Luis Varela Ruiz with professional license to practice 3776860. Said undersigned expert states the following: this official letter is addressed to Casilda Perez Martinez, Agent of the Public Prosecutor assigned to the Office of the Public Prosecutor of Huajuapan de Leon, the expert report: problems posed: determine the presence or absence of potassium nitrates in the muzzle of the barrel of the handgun, trademark Star, Spanish manufacture, registration number 1801587. Description of the exhibit:

trademark Star, Spanish manufacture, registration number 1801587, with white synthetic handles, which has reddish brown stains. The taking of samples begins at 20 hours on this same date. Techniques used: Griess Test. Procedures: to determine potassium nitrates present in the muzzle of the barrel of a firearm with a Q-tip imbued in nitric acid at 1% the muzzle of the barrel is cleaned in the chamber of said weapon, thereafter the Griess test is applied to observe the chemical reaction. A positive reaction generates a red color in the gunpowder granules. Results: negative reaction to determine for nitrate products resulting in the deflagration of the muzzle of the barrel and the chamber of the firearm trademark Star, made in Spain, registration number 1801587. These tests were concluded at 19 hours of even date, that is, December 15, 2011.

(ECF No. 17-1 at 30.)

To the extent the Morales-Hernandez argues that summaries of the witness statements are not competent evidence by which the Court can find probable cause, neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings. See Fed. R. Crim. P. 1(a)(5)(A); Fed. R. Evid. 1101(d)(3) (with the exception of the rules of privilege). The Ninth Circuit has "repeatedly held that hearsay evidence that would be inadmissible for other purposes is admissible in extradition proceedings." Emami, 834 F.2d at 1451. Therefore, "hearsay evidence and unsigned or unsworn translations of witness statements, for example, are admissible to support probable cause for the charges against the fugitive," "and the district court's determination need not even be based upon evidence that would be admissible at a preliminary hearing or in a grand jury proceeding in the United States." In re Extradition of Mathison, 974 F.Supp.2d at 1305. The fact that the evidence relied on is a summary of a witness report is not significant because hearsay evidence is admissible to support probable cause for extradition. Manta v. Chertoff, 518 F.3d 1134, 1147 (9th Cir. 2008).

Morales-Hernandez argues that there is reason to doubt the conclusions of Mr. Ramirez that the decedent did not fire the handgun because the medical examination and autopsy had been previously performed and his hands would have been swabbed and therefore it is not surprising that no nitrate residue would be found. However, Morales-Hernandez offers no evidence to explain away the opinions of Mr. Ramirez, but just speculation and argument as to why the experts opinion should not be accepted. Similarly, Morales-Hernandez argues that the opinion that there was no nitrate residue on the handgun indicating that it was not fired is unreliable. But there is competent evidence in the record to support the conclusion that the gun

was not fired.  None of the three witnesses to the shooting indicated that the decedent attempted to use the handgun, there were no casings found in the vehicle, and the magazine was empty when it was taken into evidence.  There is sufficient corroborating evidence by which the Court finds that the opinion of Dr. Ramirez is competent evidence that the decedent did not use the handgun during the incident.

Morales-Hernandez also argues that the Government has set forth no competent evidence that he was unaware that the decedent had a handgun by his right leg.[18]  However, the Government has provided the expert report of Mr. Hilario.  (ECF No. 17-1 at 109-116.)  Mr. Hilario provided a report on his reconstruction of the crime.  (Id. at 112-113.)  Mr. Hilario set forth his findings in his report.

> GENERAL CHARACTERISTICS OF THE PLACE BEING INVESTIGATED:
> It is an open zone, because it lacks boundaries.
> ➢ Auditory conditions.- Since it is an open place, it has the auditory conditions own of the place.
> ➢ Visibility conditions.- Due to the time in which the event took place, there was plenty of natural light.
> As for the firearm found by the front right quadricep of the victim.
> The vision range towards the place where the firearm was found is reduced from the outside to the inside, inasmuch as the dimension (height, medial part) of the left front door is 126 cm over the feet, this, due to his height and the characteristics of the place, prevents the perpetrator from seeing there was a firearm inside; this according to the expert reconstruction of the facts.

(Id. at 112-113.)  The Court finds this to be competent evidence to support the finding that Morales-Hernandez was not aware that the decedent had a handgun by his right leg.

Finally, Morales-Hernandez argues that Mr. Ruiz' report that there was no alcohol found in the decedent's body is not reliable.  He points to the arrest warrant which states that the alcohol test was conducted on the corpse of Lorenzo Benitez Chavez.  (ECF No. 17-1 at 27.)  However, even accepting as true that the report is in error as to the lack of alcohol in the decedent's blood this would not obliterate the other evidence in the record.  First, whether the decedent had alcohol in his blood does not change any of the findings in regards to the other

---

[18] Again, the Court notes that Morales-Hernandez mischaracterizes the evidence by stating that the handgun was in the victim's lap.  However, all evidence in the record indicates that it was by his right leg.  (ECF No. 17-1 at 75, 91, 112.)  Specifically, the crime scene photographs show that the gun was located on the seat next to the decedent's right knee consistent with the testimony of the witnesses.  (Id. at 48.)

statements in the record.

Further, there is no evidence that the decedent was drinking on the morning that he was killed. Morales-Hernandez points to pictures showing that there were empty beer cans on the floor of the truck, a beer can in the cup holder of the truck, that Mr. Salgado stated that the decedent had been very drunk the day prior, and that the decedent told Mr. Salgado that they should go drink a six pack together. But while Morales-Hernandez argues this evidence strongly suggests that he had either been drinking heavily the night before, was about to begin drinking, or was drinking at the time of the shooting (ECF No. 16 at 34), there is no evidence that the decedent was drinking at the time of the shooting and it purely speculation that the decedent had been drinking at the time of the incident. Further, it is irrelevant whether the decedent had drank heavily the day before he was murdered or that he intended to start drinking later that day.

The Court finds that the Government has submitted competent evidence by which the Court finds that there is probable cause to believe that Moreno-Hernandez committed the homicide with undue advantage.

## V.

## FINDINGS AND CERTIFICATION

The Court makes the following findings:

1.      There is a valid extradition treaty between the United States of America and Mexico that has been in full force and effect.

2.      Estanislao Florencio Morales-Hernandez is the person named in the arrest warrant.

3.      The offense for which Estanislao Florencio Morales-Hernandez is charged is listed in the Treaty and is punishable in both the United States and Mexico for a period of more than one year.

4.      Articles 285 and 301 of the Oaxaca Criminal Code are substantially analogous to 18 U.S.C. § 1111 and Cal. Pen. Code §§ 187, 190.

5.      There is probable cause to believe that Estanislao Florencio Morales-Hernandez committed the charged offense.

6.      The documents required have been presented in accordance with the laws of the United States of America and the Treaty, and have been translated and duly authenticated by United States of America consul.

7.      The Court grants the request for extradition and certifies the above findings, including the finding that Estanislao Florencio Morales-Hernandez is extraditable to Mexico for the charged crime of aggravated homicide with unfair advantage, and the submitted documents and transcripts of the extradition hearings held in this case, to the Secretary of State, pursuant to 18 U.S.C. § 3184.

8.      The Clerk of the Court is DIRECTED to close this matter.

IT IS SO ORDERED.

Dated:   **March 15, 2019**

_____
UNITED STATES MAGISTRATE JUDGE